# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALFREDA HYSON,<br><br>              Plaintiff,<br><br>       v.<br><br>ARCHITECT OF THE CAPITOL,<br><br>              Defendant. | Civil Action 08-00979 (HHK) |

## MEMORANDUM OPINION AND ORDER

Alfreda Hyson brings this action against the Architect of the Capitol, alleging that the Architect and its employees discriminated against her on the basis of her gender, retaliated against her for undertaking protected activities, and harassed her, creating a hostile work environment, in violation of the Congressional Accountability Act of 1995 ("CAA"), 2 U.S.C. § 1301 et seq.[1]  Before the Court is the Architect's motion for summary judgment and dismissal for lack of subject-matter jurisdiction [#21].[2]  Upon consideration of the motion, the opposition thereto, oral argument of counsel, and the record of this case, the Court concludes that the Architect's motion must be granted in part and denied in part.

---

[1]     Although Hyson's complaint cites Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and not the CAA, as the source of the cause(s) of action alleged therein, Compl. at 5, it is in fact the CAA and not Title VII that creates a cause of action for legislative employees who allege discrimination or retaliation.  See 2 U.S.C. § 1311(a).

[2]     Although the Architect's motion itself seeks only summary judgment, the Architect's memorandum in support of his motion argues that the Court has no subject-matter jurisdiction over at least some of Hyson's claims.  Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 14–22.  Further, the Court has an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority.  See Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 196 (D.C. Cir. 1992).  Accordingly, the Court treats the motion as requesting both dismissal and summary judgment.

# I. BACKGROUND

## A.    The Congressional Accountability Act

The Congressional Accountability Act of 1995, 2 U.S.C. § 1301 *et seq.*, extends the protections of a number of federal remedial statutes, including Title VII of the Civil Rights Act of 1964, to employees of the legislative branch.[3]  In passing the CAA, Congress created the Office of Compliance, through which legislative employees must attempt to address their grievances before seeking judicial or administrative redress. *See id.* § 1381(a).  First, employees must, within 180 days of the incident at issue, seek counseling with the Office of Compliance. *Id.* § 1402(a).  Next, they must seek mediation with the Office. *Id.* § 1403(a).  Finally, they may elect to pursue an administrative remedy or file a complaint in U.S. district court, between 30 and 90 days after the end of mediation. *Id.* §§ 1404–05, 1408.  The CAA vests the district courts with jurisdiction over CAA claims brought by covered employees, provided that the employee-plaintiff has completed counseling and mediation for the violation in question. *Id.* § 1408(a). All other judicial review is prohibited. *Id.* § 1410.  This statutory framework has been in place throughout the events that constitute the subject matter of this litigation.

## B.    Factual Background

Hyson began her employment with the Architect as a custodial team leader in September of 2001.  In that role, she was responsible for overseeing and performing custodial tasks in various legislative branch buildings.  Def.'s Mem. Ex. B ("Hyson Dep.") at 18–19, 30.  After

---

[3]     While the CAA does not extend to every employee of the legislative branch, the Architect does not contest that Hyson is a "covered employee" under 2 U.S.C. § 1301, which expressly includes "any employee of the Office of the Architect of the Capitol." *See id.* §§ 1301(3)(F), (5).

some time, Hyson came to feel that she was being singled out by management for blame when other custodial employees did not complete tasks.  Accordingly, she bid for and received a reassignment to the "Tiger Team," which would allow her to work alone.  Hyson Dep. at 58.

Hyson felt, however, that management continued to mistreat her after her reassignment to the Tiger Team.  At various times between 2002 and 2007, Hyson received memoranda of counseling (essentially, written warnings) from various managers, asserting that she had exhibited unprofessional behavior, failed to answer her radio, or failed to properly oversee or support her custodial team.  *See, e.g.*, Def.'s Mem. Ex. C (Mem. of Counseling, Aug. 14, 2002), Ex. D (Mem. of Counseling, Oct. 9, 2003), Ex. E (Mem. of Counseling, Sept. 26, 2005),  Ex. F (Mem. of Counseling, Nov. 14, 2005).  Hyson disputes these allegations, asserting that they are unfair or deliberately deceptive.  *See, e.g.*, Hyson Dep. at 65, 223.

Hyson believed that the custodial managers had singled her out for mistreatment because of her gender and because she had filed Equal Employment Opportunity (EEO) complaints and testified in co-workers' EEO proceedings.  Her belief was based in part on remarks made by supervisors Delano Reeves, who called Hyson "too delicate," Hyson Dep. at 116, and Rick Joyce, who said that employees were "either . . . with [him] or . . . "against [him]."  Hyson Dep. at 130.  According to Hyson, this mistreatment escalated over time to include difficult or impossible assignments and daily threats to her job by Joyce.  Hyson Dep. at 122, 125–26. Hyson also describes having difficulty obtaining accommodations for a medical condition that required her to alter her work uniform.  *See* Hyson Dep. at 133–98.

In January of 2007, Hyson applied for a promotion to Laborer Assistant Supervisor via the Avue online application service.  The application service generated automated scores for each

applicant based on a set of preselected criteria; Hyson received a score of 96 out of a possible

100.  Def.'s Mem. Ex. Z (Candidate List) at 2.  Five candidates with scores ranging from 100 to

92, including Hyson, were selected to interview for the position.  None of those candidates were

ultimately selected; instead, Rock Celin, who had occupied the vacant position in a temporary

capacity for the previous four months, was selected.  Def.'s Mem. Ex. AA (Reeves Decl.) ¶¶ 2–4.

Celin, who had received an automated score of 88, was not interviewed before his selection.

Hyson attributes Celin's selection — and her non-selection, despite a higher initial score — to

his gender.  She also asserts that Celin was a favorite of supervisors, and would perform favors

for them.  Hyson Dep. at 229–30.

In September of 2007, Hyson received a memorandum of counseling from Alfred Brice,

in which he reprimanded her for failing to respond to repeated radio calls on the morning of

September 7.  Def.'s Mem. Ex. H (Mem. of Counseling, Sept. 7, 2007).  Hyson asserts that her

radio was broken, preventing her from responding, and that she was not authorized to obtain a

replacement.  Hyson Dep. at 206.

A few days later, Hyson attended a meeting with supervisors Alfred Brice, Delano

Reeves, and Rick Joyce, where they suggested that she enroll in the Employee Assistance

Program ("EAP"), which includes "free, voluntary, short-term counseling and referral for various

issues affecting employee mental and emotional well-being."[4]  They asserted that Hyson suffered

from anger that impacted her workplace behavior.  Hyson disagreed, asserting that she did not

---

[4]      The Court takes judicial notice of this description of federal agency EAPs, which comes from the website of the U.S. Office of Personnel Management.  *See Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008) (taking judicial notice of a document from OPM's website because it was "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned" in the meaning of Fed. R. Evid. 201(b)).

suffer from any anger problems that could impact her work, and declined to enroll in the EAP.

Hyson Dep. at 72–76.  On the same day, Hyson requested sick leave.  This request was initially

denied by Alfred Brice, but subsequently granted by Dennis Campbell.  Hyson Dep. at 233;

Def.'s Mem. Ex. DD (Supplemental Mem.) at 2.

 In October of 2007, Hyson made a formal request for counseling with the Office of

Compliance.  Def.'s Mem. Ex. BB (Certification, Case No. 08-AC-10) at 2.  She submitted a

typed memorandum to accompany her request, in which she asserted that she had been passed

over for the Laborer Assistant Supervisor position because of her gender, that management had

retaliated against her for her involvement in prior Office of Compliance and EEO activity, that

management had created a hostile work environment for her by repeatedly threatening her job

without cause, and that she had been temporarily denied leave without justification.  Def.'s Mem.

Ex. DD (Supplemental Mem.) at 1–2.  After completing the Office of Compliance's counseling

and mediation programs, Hyson commenced this action.

## II.  LEGAL STANDARDS

### A. Lack of Subject-Matter Jurisdiction

 Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss a

complaint, or a claim therein, for lack of subject-matter jurisdiction.  FED. R. CIV. P. 12(b)(1);

*see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are

courts of limited jurisdiction. . . . It is to be presumed that a cause lies outside this limited

jurisdiction . . . .").  In response to such a motion, the plaintiff must show that her claims lie

within "the judicial Power of the United States," U.S. CONST. art. III, § 1, and that a federal

statute grants the Court jurisdiction to hear those claims.  *Micei Int'l v. Dep't of Commerce*, 613

F.3d 1147, 1151 (D.C. Cir. 2010) (citing *Mayor v. Cooper*, 73 U.S. 247, 252 (1868)); *see also*

*Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008).  If the plaintiff cannot establish both

elements, the Court must dismiss the action.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,

94 (1998) (citing *Ex parte McCardle*, 7 U.S. 506, 514 (1868)).  The Court will, however,

"assume the truth of all material factual allegations in the complaint and 'construe the complaint

liberally, granting plaintiff the benefit of all inferences that can be derived from the facts

alleged.'"  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v.*

*Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

## B.      Summary Judgment

A motion for summary judgment should be granted only "if the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit

under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The

movant must support its factual positions by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations,

stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P.

56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets its burden, the non-moving party must then establish that a

genuine dispute as to any material fact actually exists.  *See Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986).  To meet its burden, the non-moving party must show

that "the evidence is such that a reasonable jury could return a verdict" in its favor.  *Anderson*,

477 U.S. at 248.  Such evidence must consist of more than mere unsupported allegations or

denials and must set forth specific facts showing that there is a genuine dispute for trial.  *See* FED.

R. CIV. P. 56(c)(1), (e); *Celotex*, 477 U.S. at 322 n.3.  If the evidence is "merely colorable" or

"not significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at

249–50.

## III.  ANALYSIS

Hyson alleges that the Architect engaged in three distinct unlawful employment practices:

disparate treatment on the basis of gender; retaliation for engaging in protected activity; and the

creation of a hostile work environment, both in retaliation for engaging in protected activity and

on the basis of gender.[5]  The Court will address each claim in turn; however, it must first clarify

the scope of the factual allegations it may consider while doing so.  As explained below, there is

substantial doctrinal confusion regarding the scope of the allegations that an employment

discrimination plaintiff may raise for the first time in court.  Here, however, the Court will not

attempt to resolve that confusion, because it concludes that the majority of Hyson's allegations

are unexhausted regardless of which standard is applied.

---

[5]       Because Hyson's complaint is less than entirely clear as to the contours of each
theory (and, for that matter, the unlawful motivations allegedly underlying the conduct
described), the Court looks to Hyson's opposition to the Architect's motion for summary
judgment for clarification.  *See Pegram v. Herdrich*, 530 U.S. 211, 230 n.10 (2000) ("[W]e may
use [a party's] brief to clarify allegations in her complaint whose meaning is unclear." (citing
CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1364
(1990))).

**A.      Administrative Exhaustion of Claims Before the Office of Compliance**

As described above, the CAA requires that employees follow the counseling and

mediation procedures prescribed therein before bringing a CAA claim in federal court.  2 U.S.C.

§§ 1401, 1404, 1408.  These exhaustion requirements are jurisdictional in nature.  *Id.* §§ 1408,

1410; *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 705–06 (D.C. Cir. 2009)

(holding that the CAA's counseling and mediation requirements deprive the courts of subject-

matter jurisdiction over non-exhausted claims).  This Court thus lacks jurisdiction over any of

Hyson's claims that were not properly exhausted.

The parties agree that Hyson did exhaust some of her claims before the Office of

Compliance.  *See* Def.'s Mem. at 16; Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at

19–20.  They also agree on the specific content of the allegations she made there; the Architect

avers, and Hyson admits, that she raised before the Office of Compliance only those allegations

she recorded in the memorandum that she submitted to the Office, Def.'s Mem. Ex. DD

(Supplemental Mem.), to accompany her request for counseling.  *See* Def.'s Statement of

Material Facts ¶ 62; Pl.'s Opp'n at 17.  The parties disagree, however, on the scope of the factual

allegations that Hyson may now raise before this Court.

The Architect argues that Hyson is now limited not merely to the "claims" *qua* theories of

CAA violation that she raised before the Office of Compliance, but also to the specific factual

allegations she made there.  Def.'s Mem. at 16–22.  Hyson rejoins that, by completing the

counseling and mediation process and commencing this action, she "exhaust[ed] her gender

discrimination, reprisal, and hostile work environment claims."  Pl.'s Opp'n at 20.  This

statement, in combination with the plethora of factual allegations contained in the complaint but

8

not raised before the Office of Compliance, demonstrates that Hyson believes that once a "claim" in the broad sense of a *type* of violation has been raised before the Office of Compliance, any set of factual allegations that could fit into such a theory may be raised for the first time before the Court.  As is explained below, this impression is only correct as to hostile work environment claims, and then, only partially.[6]

1.      **The Scope of Title VII's Exhaustion Requirement under *Park v. Howard University* and *National Railroad Passenger Corp. v. Morgan***

Prior to 2002, courts in this Circuit considering whether an employment discrimination plaintiff could raise specific factual allegations in court that were not raised during the administrative exhaustion process applied the test articulated in *Park v. Howard University*, 71 F.3d 904 (D.C. Cir. 1995), which required new allegations to be "like or reasonably related to the allegations of the [administrative] charge and growing out of such allegations." *Id.* at 907 (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)) (internal quotation marks omitted); *see Bowie v. Ashcroft*, 283 F. Supp. 2d 25, 34–35 (D.D.C. 2003).  Under this standard, plaintiffs could only raise those allegations that would fit within the scope of "the administrative investigation that can reasonably be expected to follow the charge of discrimination."  *Park*, 71 F.3d at 907 (quoting *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981)) (internal quotation marks omitted).

---

[6]      Although Hyson fails to squarely confront the Architect's argument about the scope of the exhaustion requirement, the Court cannot agree with the Architect's assertion, *see* Def.'s Reply at 5 n.4, that she has conceded it.  She does argue, albeit erroneously, that her claims need not be exhausted because they are based on non-discrete violations, and that the continuing violation doctrine supports her claims.  *See* Pl.'s Opp'n at 20.

In 2002, however, the Supreme Court decided *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).[7]  The *Morgan* Court held that an employee may not base any Title VII claims on discrete incidents of discrimination that occurred beyond the statutory window for commencing administrative action, "even when they are related to acts alleged in timely filed charges." *Id*. at 113.  This holding largely vitiated the "continuing violation" doctrine employed by some lower courts, which had "allow[ed] courts to consider conduct that would ordinarily be time barred as long as the untimely incidents represent an ongoing unlawful employment practice." *Id.* at 107 (quoting *Morgan v. Nat'l R.R. Passenger Corp.*, 232 F.3d 1008, 1014 (9th Cir. 2000)) (internal quotation marks omitted).[8]

The *Morgan* Court also held, however, that otherwise time-barred allegations *could* form part of a hostile environment claim, so long as at least one incident had occurred within the statutory time period and the incidents together created the hostile environment.  *Id.* at 115–17. In drawing this distinction between "discrete" acts of discrimination and hostile environment claims, the Court relied on the observation that discrete acts, "such as termination, failure to promote, denial of transfer, or refusal to hire," can be traced to a particular moment of occurrence, *id.* at 115, whereas hostile environment claims inherently involve a course of repeated conduct and thus "cannot be said to occur on any particular day."  *Id.*

---

[7]     Although *Morgan* was a Title VII case, "[t]he rationale and holding in *Morgan* are equally applicable to civil rights claims brought under the CAA." *Brady v. Livingood*, 360 F. Supp. 2d 94, 102 (D.D.C. 2004).

[8]     Thus, when Hyson argues that even if any of her allegations are deemed unexhausted, they may now be raised "under the continuing violation doctrine," Pl.'s Opp'n at 20, she is incorrect. *See Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 368 (D.C. Cir. 2007) (explaining *Morgan*'s constriction of the continuing violation doctrine).

Although *Morgan* directly addressed only discrete acts occurring *before* the statutory filing period, a number of lower courts have "understood [it] to also bar [claims regarding] discrete acts occurring *after* the time period, after the filing of an administrative complaint, when a plaintiff does not file a new complaint or amend the old complaint but instead presents these acts for the first time in federal court." *Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 149 (D.D.C. 2005) (emphasis added). This interpretation relies on *Morgan*'s emphasis on both strict compliance with procedural requirements and the severability of even closely related discrete acts to conclude that "[r]equiring a plaintiff to exhaust each discrete claim of discrimination or retaliation 'comports with the purpose of the exhaustion doctrine to give the agency notice of a claim and [the] opportunity to handle it internally and ensures that only claims plaintiff has diligently pursued will survive.'" *Id.* (quoting *Velikonja v. Mueller*, 315 F. Supp. 2d 66, 74 (D.D.C. 2004)). A significant number of cases in this district have read *Morgan* this way,[9] but the D.C. Circuit has expressly declined to clarify whether this interpretation is correct. *See Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010); *Weber v. Battista*, 494 F.3d 179, 183 (D.C. Cir. 2007).

---

[9]    *See, e.g.*, *Taylor v. Mabus*, 685 F. Supp. 2d 94, 99 (D.D.C. 2010) (Robertson, J.); *Wada v. Tomlinson*, 517 F. Supp. 2d 148, 183 (D.D.C. 2007) (Kollar-Kotelly, J.), *aff'd* 296 Fed. App'x 77 (D.C. Cir. 2008); *Camp v. District of Columbia*, 2006 WL 667956, at *7 (D.D.C. Mar. 14, 2006) (Kollar-Kotelly, J.); *Prince v. Rice*, 453 F. Supp. 2d 14, 23–24 (D.D.C. 2006) (Bates, J.); *Graham v. Gonzales*, 2005 WL 3276180, at *5 (D.D.C. Sept. 30, 2005) (Roberts, J.); *Keeley v. Small*, 391 F. Supp. 2d 30, 40–41 (D.D.C. 2005) (Bates, J.); *Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 148–149 (D.D.C. 2005) (Lamberth, J.); *Jeffers v. Chao*, 2004 WL 3257069, at *6 (D.D.C. Sept. 21, 2004) (Collyer, J.); *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 136–40 (D.D.C. 2004) (Friedman, J.); *Bowie v. Ashcroft*, 283 F. Supp. 2d 25, 34–35 (D.D.C. 2003) (Facciola, J.). This reading of *Morgan* has also been adopted by the Tenth Circuit. *See Martinez v. Potter*, 347 F.3d 1208, 1210–11 (10th Cir. 2003).

Other courts, however, have rejected this reading of *Morgan* on the ground that "*Morgan* deals with the timeliness of the administrative complaints that were made and not with whether the failure to file any administrative complaint should be excused." *Higbee v. Billington*, 246 F. Supp. 2d 10, 16–17 (D.D.C. 2003). In this district, several courts have declined to apply *Morgan* beyond its specific facts, and have instead "held that separate exhaustion is not required for acts of retaliation occurring after the filing of an administrative complaint that would have come within the 'scope of any investigation that reasonably could have been expected to result from [the] initial [administrative] charge of discrimination.'" *Jones v. Bernanke*, 685 F. Supp. 2d 31, 37 (D.D.C. 2010) (quoting *Hazel v. Wash. Metro. Area Transit Auth.*, 2006 WL 3623693, at *8 (D.D.C. Dec. 4, 2006)).[10] These courts thus continue to apply the *Park v. Howard University* test.

Atop the confusion created by these conflicting interpretations of *Morgan* lies another layer of complexity: each of the aforementioned cases dealt with exhaustion under Title VII, not the CAA. No case of which this Court is aware has yet addressed this issue as relates specifically to the CAA, which employs language different from that of Title VII and which, unlike Title VII, imposes a jurisdictional bar on non-exhausted claims. *See* 2 U.S.C. § 1408(a); *compare Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982), *with Blackmon-Malloy*, 575 F.3d at 705–06. Thus, whichever school of thought is correct as to Title VII, it is unclear whether the scope of the exhaustion requirement should be the same under both statutes.

---

[10]     *See also Thomas v. Vilsack*, 2010 WL 2507755, at *10–11 (D.D.C. June 22, 2010) (Kay, J.); *Lewis v. District of Columbia*, 535 F. Supp. 2d 1, 6–8 (D.D.C. 2008) (Urbina, J.)*; Hazel*, 2006 WL 3623693, at *8 (Roberts, J.). The Eighth Circuit has also adopted this interpretation of *Morgan. See Wedow v. City of Kan. City*, 442 F.3d 661, 673–74 (8th Cir. 2006).

2.      **The Majority of Hyson's Discrimination and Retaliation Claims Are Barred for Non-Exhaustion, but her Hostile Work Environment Claim May Include Allegations Not Presented Below**

This case is not the proper vehicle for the Court to wade into the debate described above. Many of Hyson's arguments do not directly address the impact of *Morgan* on the scope of Title VII's exhaustion requirement, and neither party addresses the potential differences between Title VII's exhaustion requirement and that of the CAA.  More importantly, it is not necessary for the Court to reach this question in order to resolve this case.  Under either *Morgan*'s test (which limits claims to those discrete acts raised during the exhaustion process) or the more lenient *Park* standard (which allows claims regarding incidents "like or related to" those acts) the result is the same: all of Hyson's new allegations are barred for non-exhaustion.  *Cf. Payne*, 619 F.3d at 65.

The parties agree that Hyson raised before the Office of Compliance only the following allegations: (1) Hyson was not selected for the Assistant Supervisor position; (2) management retaliated against Hyson for her participation in protected activity (testifying in a co-worker's case against the Architect and a prior administrative complaint of her own) by giving her an unwarranted memorandum of counseling and by demanding without justification that she enroll in the Employee Assistance Program; (3) Hyson was initially denied leave on September 13, 2007; and (4) Hyson was subjected to a hostile work environment resulting from constant threats to her job.  *See* Def.'s Mem. Ex. DD (Supplemental Mem.) at 1–2.  An administrative investigation of these allegations could not reasonably be expected to uncover, for example, the difficulty Hyson allegedly had obtaining an accommodation for an allergy to her work uniform, or a retaliatory demand that Hyson stop associating with a particular coworker.  *See* Pl.'s Opp'n at 10, 11.  Simply put, all of the claims that Hyson raises for the first time before this Court are

simply too removed — in time, nature, or both — from those she raised below to go forward,

even under the more flexible *Park* standard. *See Marshall v. Fed. Express Corp.*, 130 F.3d 1095,

1098 (D.C. Cir. 1997) (under *Park*, although not every detail of a civil claim must be raised

below, the substance thereof "must fall within the scope of 'the administrative investigation that

can reasonably be expected to follow the charge of discrimination.'" (quoting *Park*, 71 F.3d at

907)). Accordingly, in evaluating Hyson's discrimination and retaliation claims, the Court will

consider only those allegations contained in the memorandum she submitted at the beginning of

the Office of Compliance process. Any claims of discrimination or retaliation based on other

events are thus dismissed for lack of subject-matter jurisdiction.[11]

Conversely, Hyson's hostile work environment claim is not limited to those specific

allegations recorded in her memorandum. Whatever impact *Morgan* may have had on other

types of Title VII (and CAA) claims, there appears to be no confusion as to its holding regarding

hostile work environment claims: plaintiffs may incorporate non-exhausted allegations into a

hostile work environment claim so long as some allegations were exhausted and all of the

allegations together form one hostile environment claim. *See Morgan*, 536 U.S. at 115–17;

*Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 n.10 (D.D.C. 2005) ("Unlike discrete claims of

---

[11]    One possible exception relates to the various memoranda of counseling that
Hyson received, some or all of which she alleges were retaliatory. *See* Pl.'s Opp'n at 26. An
administrative investigation based on the claims that Hyson raised before the Office of
Compliance — which included an allegation that she had received an unjustified memorandum
of counseling on September 10, 2007 — might reasonably be expected to reach some of the other
memoranda she received (although no other memorandum addressed the same alleged conduct).
As explained below, however, Hyson cannot show that the memoranda of counseling she
received constituted materially adverse action within the meaning of Title VII or the CAA.
Accordingly, even if these allegations meet either exhaustion test, they cannot serve as the basis
for a successful retaliation claim, and the Court will not consider them.

discrimination and retaliation, the exhaustion requirement on a hostile work environment claim is less stringent.  Plaintiff need only have filed an [administrative] complaint alleging some of the claims that comprise the hostile work environment claim." (citing *Morgan*, 536 U.S. at 122)). Accordingly, in determining whether Hyson's hostile environment claim can survive summary judgment, the Court will consider all of the allegations in the complaint that could, along with the exhausted allegations, constitute one hostile environment claim.

### 3. Hyson May Attribute Her Non-Selection, the Initial Denial of Leave, and the Hostile Work Environment to Both Gender Discrimination and Retaliation

Although her discrimination and retaliation claims are restricted to the specific factual allegations exhausted below, Hyson may now attribute the specific acts she alleges to motivations not previously ascribed to them.  Before the Office of Compliance, Hyson claimed that her non-selection was gender-based and that the Architect's retaliatory activity consisted of an unjustified memorandum of counseling and the demand that she enter the Employee Assistance Program.  *See* Def.'s Mem. Ex. DD (Supplemental Mem.).  Now, Hyson claims that her non-selection was both discriminatory *and* retaliatory.  *See* Compl. ¶ 30; Pl.'s Opp'n at 26.[12] It is true that a plaintiff may not for the first time in a civil complaint attribute a particular alleged act to an illicit motivation never mentioned during the exhaustion process.  *See, e.g.*, *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 34–36 (D.D.C. 2008) (refusing to consider a race discrimination claim where the plaintiff had previously alleged only national origin and age discrimination). Here, however, where Hyson alleged both gender discrimination and retaliation before the Office of Compliance (albeit with regard to different acts), the Court cannot conclude that the Architect

---

[12]     The Architect does not address this issue and simply argues that Hyson has not stated a claim regarding her non-selection under either theory.

and the Office were not properly on notice as to the types of animus that she believed had

motivated the actions against her.  *See Loe v. Heckler*, 768 F.2d 409, 420 (D.C. Cir. 1985)

(naming "notice [to the employer] that its actions allegedly violated Title VII" as a core purpose

of the exhaustion requirement).  Accordingly, the Court will consider Hyson's non-selection

under both theories.  By the same token, because Hyson's memorandum did not expressly

attribute her initial denial of leave for September 13, 2007 or her hostile work environment to

either motivation, the Court will consider both.[13]

B.      **The Merits of Hyson's Claims**

        The Court now turns to the substance of Hyson's claims.  Because the CAA incorporates

Title VII's substantive protections, courts evaluate CAA claims with reference to the substantial

body of Title VII case law, and this Court will do likewise.  *See Herbert v. Architect of Capitol*,

766 F. Supp. 2d 59, 74 n.13 (D.D.C. 2011); *Johnson v. U.S. Capitol Police Bd.*, 2005 WL

3276305, at *1 (D.D.C. July 26, 2005); *Brady v. Livingood*, 360 F. Supp. 2d 94 (D.D.C. 2004).

---

[13]      In reaching this conclusion, the Court is mindful that it "must take care not to
construe the CAA in such a manner as to 'erect a massive procedural roadblock to access to the
courts.'"  *Blackmon-Malloy*, 575 F.3d at 713 (quoting *President v. Vance*, 627 F.2d 353, 362
(D.C. Cir. 1980)).  Courts must be especially wary of this risk in the context of the CAA, which
prescribes a less formal administrative process than does Title VII.  For example, there is no
indication that Hyson was required to submit any written charge or complaint whatsoever,
whereas private-sector Title VII complainants must file an administrative charge with the EEOC,
which, while not a formal legal filing, frequently describes the alleged violations with some
specificity (and even has check-boxes for the basis of the alleged discrimination), and which the
plaintiff has the opportunity to review and supplement before signing.  *See* 42 U.S.C. § 2000e-
5(b) ("Charges shall be in writing under oath or affirmation . . . ."); *Alfred v. Scribner Hall &
Thompson, LLP*, 473 F. Supp. 2d 6, 8 (D.D.C. 2007) (explaining the EEOC administrative
charge process).  To scrutinize Hyson's informal memorandum with the same intensity that is
normally applied to an EEOC administrative charge would be to treat the exhaustion requirement
as "an end in itself" in contravention of Congressional intent.  *Blackmon-Malloy*, 575 F.3d at 713
(quoting *President*, 627 F.2d at 362).

The Court first addresses Hyson's claim that she was passed over for the Assistant Supervisor position on the basis of her gender.

### 1.    A Reasonably Juror Could Conclude that Hyson's Non-Promotion Was Based on her Gender

For many years, a court ruling on a defendant's motion for summary judgment in a Title VII disparate treatment case was required to apply the complex burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  The D.C. Circuit, however, has clarified that "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision," the district court should move directly to the dispositive inquiry: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?"  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  In other words, the Court must determine whether the proffered explanation is truthful, or a mere pretext for discrimination.  *See id.* at 495.  Because Hyson's non-selection constituted an adverse employment action and the Architect has asserted a legitimate, non-discriminatory reason therefor, the Court turns directly to that question.

The Architect's explanation for Hyson's non-selection is essentially that Rock Celin, who was ultimately selected for the Assistant Supervisor position, was the most qualified candidate by virtue of his previous work experience with the Architect, his "familiarity with the paperwork requirements of the [Assistant Supervisor] job," and his performance as acting Assistant Supervisor, a role he had held for four months prior to the hiring process in question.  Def.'s

Mem. at 32.  Hyson counters that this justification is unpersuasive — and thus pretextual — because Hyson was "clearly more qualified."  Pl.'s Opp'n at 23.  In support of this claim, Hyson observes that she had post-secondary education, while Celin did not; that she scored higher than he did on the online application (96 versus 88 points out of a possible 100); and that she had been employed with the Architect for four years longer than he had.  Pl.'s Opp'n at 23.  The Architect, in turn, responds that these facts do not bear directly on the candidates' respective abilities to succeed in the Assistant Supervisor position, whereas Celin's prior experience in the precise position at issue is highly probative.  Def.'s Reply to Pl.'s Opp'n ("Def.'s Reply") at 9–11.

Where, as here, the parties' quarrel focuses on a dispute over the relative qualifications of candidates for a particular position, the courts "have consistently declined to serve as a 'super-personnel department that reexamines an entity's business decisions.'"  *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (quoting *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999)).  Accordingly, for the Court to infer discrimination on the basis of qualifications alone, "the qualifications gap must be great enough to be inherently indicative of discrimination."  *Id.*  In a case of this sort, however, "the plaintiff is not limited to challenging the employer's explanation, but can also avoid summary judgment . . . by presenting other evidence, either direct or circumstantial, that permits an inference of discrimination."  *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1295 n.11 (D.C. Cir. 1998) (en banc).  Here, Hyson does both.

### a.    Relative Qualifications of the Candidates

First, Hyson attacks Celin's qualifications.  One of her central arguments is that she out-scored Celin on the electronic application, 96 to 88.  In a vacuum, this fact might imply that something was amiss; however, as the Architect points out, two other male candidates received

perfect scores of 100, and neither was selected.  Additionally, the automated score was just one of several factors considered in the hiring process.  Thus, the Court cannot conclude that Hyson's score was improperly disregarded on the basis of her gender.  Likewise, the fact that Hyson was interviewed but Celin was not does not, by itself, raise an inference of gender discrimination, given that the same two high-scoring male candidates were also interviewed but not ultimately selected.[14]  Further, the Court is not in a position to discern a meaningful difference between the value of Celin's four months of experience in the position in question and Hyson's longer service with the Architect in a different position (or her post-secondary education in criminal justice). *See Aka*, 156 F.3d at 1294 ("In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call.").  Accordingly, Hyson's arguments regarding the qualifications of the two candidates are not by themselves sufficient to raise a genuine issue of material fact.

### b.      Discriminatory Remark Made by The Selecting Official

Next, however, Hyson points to a remark made by Delano Reeves, the official charged with filling the Assistant Supervisor vacancy, in which he chided her for being "too delicate." Hyson Dep. at 116.  This remark, which the Architect fails to address, could easily be understood as casting aspersions on Hyson's gender or stereotyping her on that basis.  The question thus becomes how much weight should be accorded to this statement.

---

[14]      To the extent that Hyson argues that the application score or interview should have played a larger role in the hiring decision, the Court "defer[s] to the Government's decision of what nondiscriminatory qualities it . . . seek[s] in filling the . . . position." *Stewart v. Ashcroft*, 352 F.3d 422, 429 (D.C. Cir. 2003).

Generally, courts are reluctant to infer unlawful discrimination on the basis of "stray remarks" in the workplace.  *See, e.g.*, *Wicks v. Am. Transmission Co.*, 701 F. Supp. 2d 38, 44 (D.D.C. 2010), *aff'd*, 2010 WL 4340376 (D.C. Cir. Oct. 1, 2010).[15]  Discriminatory comments, however, are much more likely to raise an inference of bias in employment decisions where they "refer directly to the plaintiff," *Prater v. FedEx Corp. Servs., Inc.*, 2009 WL 1725978, at *7 (D.D.C. June 18, 2009) (quoting *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1479 (10th Cir. 1996)), and where they are made by decisionmakers, rather than coworkers without influence over the challenged decision.  *See Forman v. Small*, 271 F.3d 285, 293 (D.C. Cir. 2001).

Here, the fact that this remark was made directly to Hyson, in reference to her, by the official responsible for selecting the new Assistant Supervisor, weighs heavily in Hyson's favor. It is, however, unclear whether the remark was made in relation, or temporal proximity, to the promotion process.  Hyson Dep. at 116–18 ("Q: And you don't recall any other aspect of the context of that statement?  A: No."); *see Forman*, 271 F.3d at 293 (explaining that discrimination may be inferred where decisionmakers "express . . . discriminatory feelings around the relevant

---

[15]    This is especially true in the context of the prima facie burden-shifting scheme and the direct-versus-indirect evidence inquiry.  *See Wicks*, 701 F. Supp. 2d at 44 ("'[D]irect evidence does not include stray remarks in the workplace'" (quoting *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 96 (1st Cir. 1996))); *Prater v. FedEx Corp. Servs., Inc.*, 2009 WL 1725978, at *6–7 (D.D.C. June 18, 2009) (holding that, without a link to the challenged decision, stray remarks did not constitute indirect evidence of discrimination sufficient to satisfy the final prong of the *McDonnell Douglas* framework).  Once the focus shifts to the ultimate inquiry of discrimination *vel non*, however, "the court considers all relevant evidence." *Brady*, 520 F.3d at 495.  Accordingly, the Court considers cases addressing the significance of such remarks in these other contexts, but does not treat them as dispositive of the ultimate inquiry here.  *See Pederson v. Mills*, 636 F. Supp. 2d 78, 82 n.2 (D.D.C. 2009) ("This Court will . . . review[] all of the evidence (of a prima facie case, pretext, and discrimination) to decide if a jury could infer discriminatory behavior by defendant.").

time in regard to the adverse employment action complained of").  Consequently, it is difficult to gauge the full significance of Reeves's remark.  *See Bennett v. Solis*, 2010 WL 2889741, at *13 (D.D.C. 2010) (emphasizing the importance of the context in which allegedly discriminatory remarks were made to their probative value in establishing pretext).

Ultimately, the Court must conclude that a reasonable juror could find that Hyson's non-promotion was based to some extent on her gender.  Although, as described above, the facts that Hyson was interviewed while Celin was not and that Hyson had a higher score than Celin on the online test do not give rise to an inference of discrimination by themselves, they might do so in combination with Reeves's remark.  *Cf. Pederson v. Mills*, 636 F. Supp. 2d 78, 84–85 (D.D.C. 2009) (holding that biased remarks by decisionmakers, in combination with evidence of a minor qualification gap in favor of the plaintiff, were sufficient to "support . . . an overall inference of discriminatory preference" and preclude summary judgment for the defendant).  Such a determination would likely come down to assessments of credibility and the drawing of inferences from all of the evidence, which are tasks for a jury.  *See Crawford-El v. Britton*, 523 U.S. 574, 599 (1998) (noting that "disputes about [a defendant's] intent . . . frequently turn on credibility assessments"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . .").  Accordingly, the Court concludes that summary judgment for the Architect as to this claim would be inappropriate.

> **2.      Hyson Has Not Raised a Genuine Issue of Material Fact with Regard to Retaliation for Participation in Protected Activity**

Like discrimination claims, retaliation claims have long been governed by the *McDonnell Douglas* framework; however, the D.C. Circuit has explained that the principles that led it to call *McDonnell Douglas* a "sideshow" in the discrimination context "apply equally to retaliation claims." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (quoting *Brady*, 520 F.3d at 494) (internal quotation marks omitted).   Thus, because the Architect concedes that Hyson has participated in protected activity, acknowledging Hyson's testimony in a co-worker's Office of Compliance proceedings in 2001, her EEO complaint in 2004, and her Office of Compliance proceedings in April 2006, the Court "proceed[s] to the ultimate issue of retaliation *vel non* instead of evaluating whether [Hyson has] made out a prima facie case." *Jones*, 557 F.3d at 678.[16]

As explained above, Hyson's retaliation claims are limited to those allegations she raised before the Office of Compliance; thus, the Court cannot consider the raft of incidents that Hyson now considers to be retaliatory, *see* Pl.'s Opp'n at 26, and focuses on her non-selection for the

---

[16]      The parties also agree that Hyson commenced the October 2007 Office of Compliance proceedings that resulted in the case at bar and filed an EEO complaint in April 2009.   Because, however, neither of these events could have been the impetus for the acts of retaliation alleged by Hyson *during* the October 2007 proceedings, the Court will not consider them.   Likewise, although Hyson also cites "regular[] complain[ts] to Dennis Campbell" as protected activity that prompted retaliation, the Court will not consider this allegation because it bears no resemblance to the instances of protected activity cited by Hyson before the Office of Compliance   *See Johnson-Parks v. D.C. Chartered Health Plan*, 713 F. Supp. 2d 39, 46 (D.D.C. 2010) (dismissing the plaintiff's claim for failure to exhaust remedies where "the associated protected activity in her EEOC filing [was] not the same as that identified in the . . . complaint").   Conversely, the Court will consider both Hyson's 2004 EEO complaint and her April, 2006 Office of Compliance proceedings, on the grounds that Hyson's statement in the memorandum that she was retaliated against "for my prior case" could refer to either one.

Assistant Supervisor position, the September 10, 2007 memorandum of counseling, the

September 13, 2007 meeting, and the initial September 13, 2007 denial of leave.

### a. Non-Selection for the Assistant Supervisor Position

Because the governing law is the same, s*ee Jones*, 557 F.3d at 678, the analysis

articulated above with regard to Hyson's claim of non-selection on the basis of gender applies

equally to her claim of retaliation.  Here, though, Rick Joyce's remark regarding Hyson's EEO

activity — "that she was either with him or against him," Pl.'s Opp'n at 31 — stands in for

Delano Reeves's "too delicate" comment.  That difference is significant: there is no indication

that Joyce, unlike Reeves, played any role in the Assistant Supervisor selection process.  *See*

*Sewell v. Chao*, 532 F. Supp. 2d 126, 138 n.8 (D.D.C. 2008) ("Evidence of discrimination 'does

not include stray remarks . . . *made by nondecision-makers* . . . .'" (quoting *Ayala-Gerena v.*

*Bristol Myers-Squibb Co.*, 95 F.3d 86, 96 (1st Cir. 1996)) (emphasis added)).

It is also notable that, as the Architect observes, significant time passed between Hyson's

protected activities and her non-selection.[17]  Hyson was notified of her non-selection roughly one

year after the April 2006 Office of Compliance proceedings, three years after her 2004 EEO

complaint, and six years after testifying in Priscilla Rucker's administrative case.  In light of this

passage of time, and the fact that Joyce apparently had no influence over the selection process,

the Court cannot conclude that an inference of retaliation arises with regard to Hyson's non-

selection for the Assistant Supervisor position.

---

[17]     Although temporal proximity (or a lack thereof) between the protected activity
and the alleged retaliation is generally considered during the prima facie case inquiry, "it tends to
support a circumstantial inference of retaliation," and thus "applies to the ultimate inquiry as
well." *Jones*, 557 F.3d at 679.

**b.     The September 2007 Memorandum, Meeting, and Initial Denial of Leave**

Although the *McDonnell Douglas* framework has largely fallen away, one element remains: because adverse action is not only part of a plaintiff's prima facie case but also an element of a Title VII retaliation claim, *see Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002), an employment action, whatever the motive behind it, cannot constitute retaliation under Title VII or the CAA unless it is materially adverse. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008). A materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1213 (D.C. Cir. 2006)) (internal quotation marks omitted). This standard is broader than the adverse-action standard used in the discrimination context. *Id.* at 1198 n.4. Even so, not all seemingly adverse actions constitute *materially* adverse action for Title VII purposes. *See id.* ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms."). Here, each event — the memorandum of counseling, the meeting, and the initial denial of leave — does not rise to the level of materially adverse action.

**i.     The September 10, 2007 Memorandum of Counseling**

The Architect argues that a reprimand like the memorandum of counseling that Hyson received on September 10, 2007, which has no impact on an employee's "grade, salary level, job title, duties, benefits or work hours," cannot constitute materially adverse employment action. Def.'s Mem. at 25. Hyson essentially fails to challenge this argument, responding only that "a

reasonable trier of fact could find" a long list of actions, including the memorandum of

counseling, to be materially adverse.  Pl.'s Opp'n at 26.  Regardless, the Architect is correct.[18]

A letter of counseling, written reprimand, or unsatisfactory performance review, if not

abusive in tone or language or a predicate for a more tangible form of adverse action, will rarely

constitute materially adverse action under Title VII.  *See Baloch*, 550 F.3d at 1199 (collecting

cases).  Here, the memorandum of counseling described Alfred Brice's unsuccessful attempts to

reach Hyson via her radio and admonished her to keep it activated and report any malfunctions

promptly.  *See* Def.'s Mem. Ex. H (Memorandum of Counseling, Sept. 7, 2007) at 2.  It closed by

warning that "[t]his time . . . is just a counseling but if this happen[s] again, we will take the

appropriate action."  Given that the memorandum itself made clear that disciplinary action was

not forthcoming as a result of its issuance — and that "mere speculation that a letter of reprimand

*may* lead to future punishment is insufficient to establish an adverse employment action,"

*Coleman v. District of Columbia*, 2006 WL 2434926, at *4 (D.D.C. Aug. 22, 2006) — the Court

cannot conclude that a reasonable employee would have been deterred from pursuing a claim of

discrimination by the prospect of receiving a memorandum like this one.  *See Baloch*, 550 F.3d at

1199; *Herbert*, 766 F. Supp. 2d at 75 (holding that a similar written reprimand provided to an

Architect of the Capitol employee was not materially adverse because it merely criticized his job

performance).

---

[18]     The Court notes, however, that the Architect adverts to the incorrect adverse-action standard; an employer's action need not affect an employee's "grade, salary level, job title, duties, benefits or work hours" to be materially adverse.  *See Baloch v. Kempthorne*, 550 F.3d at 1198 n.4 ("Retaliation claims are 'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse.'" (quoting *Burlington N.*, 548 U.S. at 64)).

### ii.      The September 13, 2007 Meeting with Brice, Joyce, and Reeves

Likewise, the Court finds that the September 13, 2007 meeting during which Brice, Rick

Joyce, and Delano Reeves suggested that Hyson enter the Employee Assistance Program does not

constitute materially adverse action.  By Hyson's own account, upon being asked to enter the

EAP, she refused, stating that she did not feel it was necessary.  Hyson Dep. at 74.  The Architect

asserts, and Hyson again fails to contest, that neither the meeting nor Hyson's refusal to enroll in

the EAP led to any consequences whatsoever.  Def.'s Mem. at 25.  It may be that in some

circumstances a referral to counseling could have consequences sufficient to constitute materially

adverse action, but on the facts presented here, that is not the case.  *See Burlington N.*, 548 U.S.

at 71 ("Whether a particular [action] is materially adverse depends upon the circumstances of the

particular case, and 'should be judged from the perspective of a reasonable person in the

plaintiff's position, considering all the circumstances.'" (quoting *Oncale v. Sundowner Offshore

Services, Inc.*, 523 U.S. 75, 81 (1998))).  Thus, for the same reasons that it finds the

memorandum not to constitute materially adverse action, the Court concludes that the meeting

was not materially adverse.

### iii.      The Initial Denial of Leave for September 13, 2007

Finally, the Court concludes that Brice's initial denial of Hyson's September 13, 2007

leave request did not constitute materially adverse action.  The Architect argues that because

Hyson's request was eventually approved, albeit by a different manager, her denial of leave claim

was "moot *ab initio*."  Def.'s Mem. at 10 n.5, 30.  As above, Hyson replies only that "a

reasonable trier of fact could find" a denial of leave to be materially adverse.  Pl.'s Opp'n at 26.

The Architect has the stronger position.  Although a denial of leave *can* constitute materially

adverse action, *see Diggs v. Potter*, 700 F. Supp. 2d 20, 43 (D.D.C. 2010), Hyson's September

13, 2007 leave was never denied.  Her request was eventually granted, albeit after a delay, *see*

Def.'s Mem. Ex. DD (Supplemental Mem.) at 2, and such a delay would not deter a reasonable

employee from pursuing a charge of discrimination.  *See Zelaya v. UNICCO Service Co.*, 733 F.

Supp. 2d 121, 131 (D.D.C. 2010) (holding that an initial denial of leave did not constitute

materially adverse action because the plaintiff was ultimately allowed to take the leave without

any other consequence to her).[19]

### 3. Hyson Has Not Raised a Genuine Issue of Material Fact with Regard to her Hostile Work Environment Claim

Finally, the Court turns to Hyson's hostile work environment claim.  As explained above,

the Court will consider the hostile environment claim under both a retaliation theory and a gender

discrimination theory.  To survive a motion for summary judgment, a plaintiff making a hostile

work environment claim must establish a prima facie case.  To do so, she must demonstrate that:

(1) she is a member of a protected class or engaged in protected activity; (2) she was subject to

unwelcome harassment; (3) the harassment occurred because of her protected status or behavior;

(4) the harassment had the effect of unreasonably interfering with the plaintiff's work

performance and creating an intimidating, hostile, or offensive working environment; and (5)

*respondeat superior* liability applies.  *Davis v. Coastal Int'l. Sec., Inc.*, 275 F.3d 1119, 1122–23

(D.C. Cir. 2002) (citing *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir.

---

[19]     Because the memorandum, meeting, and delay in granting leave did not constitute adverse action, the Court will not consider whether they were motivated by retaliatory intent.  For the same reason, the Court also will not consider whether the delayed grant of Hyson's leave request constituted disparate treatment on the basis of gender (in which context "adverse action" is also defined more narrowly).

1997)).  A work environment, even if objectionable, does not become actionable unless "the offensive conduct 'permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 163 (D.D.C. 2007) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

Hyson argues that the Architect's managers created a hostile work environment for her by not selecting her for the Assistant Supervisor position, wrongfully denying her leave, removing her from her Team Leader position, writing her unwarranted memoranda of counseling, failing to take action against a co-worker who physically threatened Hyson, failing to provide a requested medical accommodation, "harassing" her for medical documentation to support an accommodation she had already received, assigning her unfavorable tasks, reprimanding her for associating with a subordinate, and routinely threatening her with termination.  Pl.'s Opp'n at 30.

The Architect takes issue with Hyson's hostile work environment claim on three grounds: first, he avers that the conduct Hyson alleges was neither pervasive nor severe enough to constitute a hostile environment under Title VII.  *See* Def.'s Mem. at 39.  Second, he asserts that, severity aside, Hyson has produced no evidence that any of the conduct she identifies was directed at her gender or protected activity.  Def.'s Mem. at 37–38.  Third, he argues that Hyson's hostile environment claim is built entirely on the same allegations that constituted her discrimination and retaliation claims — most of which are barred for non-exhaustion — and that she is attempting to "bootstrap" those claims into a hostile environment claim.  Def.'s Mem. at 38.  Hyson fails to squarely confront the Architect's arguments, merely describing certain events that she believes constitute "evidence of the hostile work environment" and asserting that "the

28

evidence shows that Plaintiff was discriminated against because of her protected status." Pl.'s Opp'n at 31. It is, however, precisely this causal connection that is missing from the vast majority of Hyson's allegations.

Much of the conduct that Hyson describes may have been unjustified or unprofessional, but "many bosses are harsh, unjust and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination." *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)). Thus, behavior, even if offensive or hostile, that is not linked to Hyson's gender or protected activity "cannot be used to support a hostile work environment claim." *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005). Accordingly, because Hyson is unable to tie the majority of her allegations to her gender or protected activity, the Court is unable to consider them.

The only conduct described by Hyson that *does* relate to her gender or protected activity are the remarks, made by Delano Reeves and Rick Joyce, respectively, that Hyson was "too delicate" and, with regard to her EEO activity, that "she was either with [Joyce] or against him." Pl.'s Opp'n at 22, 31. Isolated incidents, however, even if intimidating or offensive, "do not amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002). Alone, these two comments do not create harassment severe or pervasive enough to constitute an actionable hostile work environment. Accordingly, the Court concludes that summary judgment for the Architect is proper as to this claim.

**IV.  CONCLUSION**

In sum: any discrete claims of discrimination or retaliation based on factual allegations that Hyson did not raise before the Office of Compliance are dismissed for lack of subject-matter jurisdiction.  Further, the Court grants summary judgment to the Architect as to Hyson's retaliation claim and her hostile environment claim; however, Hyson's claim that her non-promotion was based on her gender may go forward.

Accordingly, it is this 10th day of August 2011 hereby

**ORDERED** that defendant's motion to dismiss and for summary judgment [#21] is **GRANTED** in part and **DENIED** in part.


Henry H. Kennedy, Jr.
United States District Judge

30